IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION


DARRELL DAVIS                                                              PLAINTIFF

v.                                                         Civil No. 1:16cv417-HSO-JCG

ALLSTATE INSURANCE COMPANY                                      DEFENDANT


**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION [74] FOR PARTIAL SUMMARY JUDGMENT**

BEFORE THE COURT is the Motion [74] for Partial Summary Judgment filed by Defendant Allstate Insurance Company ("Allstate"). After two fires broke out at a residential property owned by Plaintiff Darrell Davis ("Mr. Davis"), he filed an insurance claim with Allstate. Allstate denied the claim and asserted that Mr. Davis committed civil arson. In response, Mr. Davis filed this lawsuit against Allstate, alleging claims for breach of contract, bad faith, and punitive damages. Allstate moves for partial summary judgment on Mr. Davis' bad faith and punitive damages claims. For the reasons more fully stated below, the Motion should be granted, and Mr. Davis' claims for bad faith and punitive damages should be dismissed with prejudice.

I. BACKGROUND

A.  Factual Background

   1.   Mr. Davis Rents a House to Ms. Skipper

Mr. Davis owns a house ("Property") located in Moss Point, Mississippi. Mr. Davis did not live at the Property, but used it as a rental investment. It is

undisputed that Mr. Davis resides two or three minutes away from the Property. Pl. Exam. [74-3] at 87. In 2011, Mr. Davis incurred a net loss of $1,149.00 on the Property. Pl. Dep. [74-6] at 63-64. In 2013, Mr. Davis earned a net profit of $2,036.00 on his two rental properties, one of which was the Property. *Id.* at 60-61. The Property was insured by Allstate under a policy of insurance for a period beginning on April 14, 2014. Policy Decl. [74-1] at 4. The insurance policy does not cover losses caused by "[i]ntentional or criminal acts of or at the direction of any insured person, if the loss that occurs: a) may be reasonably expected to result from such acts; or b) is the intended result of such acts." *Id.* at 32.

Beginning in early 2014, Mr. Davis rented the Property to Jackie Skipper ("Ms. Skipper"). Pl. Exam. [74-3] at 13-14. Ms. Skipper gave Mr. Davis $150.00 as a deposit to move in, although the deposit was supposed to be $550.00. *Id.* at 49-50. The Mississippi Regional Housing Authority paid Ms. Skipper's rent of $800.00 per month. *Id.* at 13-14. On August 5, 2014, Ms. Skipper forwarded a complaint to the Housing Authority regarding broken appliances in the Property and Mr. Davis' treatment of her. Skipper Compl. Form [74-10]. The Housing Authority notified Mr. Davis of the complaint, at which point he went to speak with Ms. Skipper. Pl. Exam. [74-3] at 42. Ms. Skipper told Mr. Davis that "she just wanted to just get out," presumably referring to her lease. *Id.* Mr. Davis responded, "no problem. All you had to do was come to me and I would have let you out." *Id.* The two agreed that Mr. Davis would make an effort to let Ms. Skipper move out. *Id.* at 43. According to Mr. Davis, her lease expired on October

1, 2014.  *Id.*

Ms. Skipper moved out during the "late part of September" 2014, but she "still had the keys to the place."  *Id.* at 34.  At some point after October 1, 2014, Mr. Davis visited the Property and noticed that Ms. Skipper had many items still in the house – "her radios, her TVs, TV stands, all her table stuff was in there, aquarium, food and everything."  *Id.* at 34-35.  Mr. Davis believed that he "still couldn't touch her stuff until [he] got a order to remove her from the courts."  *Id.* at 34.

Mr. Davis also observed extensive damage to the interior of the residence. *Id.* at 34-35.  "Pretty much all the rooms" had three-inch and six-inch holes in the wall.  *Id.*  Several walls also had six to twelve-inch gashes.  *Id.* at 22.  The bathroom and room doors "were just hanging on the frame" and "[a]ll the smoke detectors were down in the back of the house."  *Id.* at 34-35.  Mr. Davis "would have to get somebody in there to clean it when she moved out" because there were "gobs of food and stuff that was splattered on the wall."  *Id.* at 39.  Moreover, the Property was infested with "roaches and stuff just everywhere."  *Id.*  Mr. Davis believed he would have to replace the oven in the house because in his view it was substantially damaged.  *Id.*  Ms. Skipper also left Mr. Davis "with a $400 light bill."  Pl. Dep. [74-6] at 71.

2. <u>Two Fires Ablaze in the Property</u>

On the morning of October 5, 2014, two fires broke out at separate times inside the Property.  The exact time of the first fire is unclear, as there is some

3

evidence that the first fire alarm was received at 1:01 a.m., Jones Report [74-9] at 5, but according to Allstate claims adjuster Wilbur Jordan ("Jordan"), the fire department was first dispatched at 4:02 a.m. and arrived at the Property at 4:05 a.m. Jordan Dep. [74-8] at 35. "[T]he initial fire originated along the south living room wall with the flames spreading vertically to the attic. The responding firemen contained the damages to this location and departed the premises." Jones Report [74-9] at 5. The fire department was again dispatched to the Property at 6:03 a.m. and arrived at 6:06 a.m. Jordan Dep. [74-8] at 35-36. This time, "flames were venting the roof over the west end of the house." Jones Report [74-9] at 5. This second fire "originated in the west hallway closet and spread vertically into the attic." *Id.* at 3.

    3.    <u>Allstate Investigates and Denies Mr. Davis' Insurance Claim</u>

Mr. Davis filed a claim on his insurance policy with Allstate for damage incurred as a result of the fires. On October 6, 2014, Allstate requested Gary Jones ("Jones") to investigate the origin and cause of the fires. Jones Report [74-9] at 2. Jones is employed as a Fire Investigator with a company called EFI Global, Inc. Jones Aff. [74-2] at ¶ 2. Jones has been working continuously in the field of fire and explosion investigations for over thirty-five years and has been accepted as an expert in this field in several states. *Id.*

Jones began investigating the following day on October 7, 2014. *Id.* During his inspection, Jones noted that "[e]lectrical service was not connected to the building" and gas service was also not in use at the time of loss. Jones Report [74-

4

9] at 3. With regard to the second fire, Jones noticed that "[a]n access opening in the west hallway ceiling had been removed so the flames could easily access the attic." *Id.* at 3-4. Jones found that "[t]he flooring was damaged from direct flame impingement consistent with an ignitable liquid." *Id.* at 4. Jones detected "an unusual odor . . . similar to gasoline" when he opened the hallway HVAC closet. *Id.* Jones submitted two fire debris samples to EFI Global's chemical lab to test for ignitable liquids. Jones Report [74-9] at 4, 18. The lab reported that the fire debris from the hallway closet did not contain a measurable level of ignitable liquids. *Id.* However, the HVAC filter and debris from the HVAC closet contained a relatively high level of gasoline residue. *Id.*

On October 13, 2014, Jones prepared his Fire Investigation Report. *Id.* at 1. Jones concluded:

> All potential accidental heat/ignition sources within the areas of origin have been excluded. The absence of electrical and gas services eliminates either utility or an appliance requiring their service. Separate points of origin are indicative of human involvement and the presence of gasoline where none should have been found is consistent with an incendiary fire cause.
>
> . . . .
>
> Fire pattern analysis indicates that the fire originated in separate locations in the living room and west hallway closet. Evidence indicates that ignition resulted from an open flame. Evidence indicates the first fuel ignited consisted of gasoline vapors followed by available combustibles. Events bringing ignition and fuel together include human involvement.
>
> The cause of the fire is classified incendiary.

*Id.* at 4-5.

5

Moss Point Police Officer Germaine Flaggs also investigated the incident "due to suspicious circumstances." *Id.* at 5. Flaggs used a hydrocarbon meter which detected an odor of accelerant, though there is no evidence before the Court when or where Flaggs used this device. Flaggs Dep. [82-1] at 70-71. On October 13, 2014, Flaggs sent two debris samples to the Mississippi Crime Laboratory to test for ignitable liquids. Miss. Crime Lab Report [79-8]. The Crime Lab tested the samples and generated a report on October 23, 2014, after Jones had completed his report, which concluded that no ignitable liquids were detected on either sample. *Id.* A week or two after Flaggs collected the debris samples, he was transferred from crime scene investigations and reassigned to patrol duties. Flaggs Dep. [82-1] at 40. Flaggs took no other steps on the investigation. *Id.*

On November 24, 2014, Mr. Davis submitted a Sworn Statement in Proof of Loss and asserted that the "house was set on fire by an unknown person." Statement [1-2] at 1. During his deposition in this case, Jordan has opined that Mr. Davis "would have collected $91,000 had the house burned." Jordan Dep. [74-8] at 64. As part of its investigation, Allstate examined Mr. Davis and his wife, Christine Davis ("Mrs. Davis"), under oath on February 6, 2015. Mr. Davis testified that during the early morning of October 5, 2014, he was home asleep. Pl. Exam. [74-3] at 84. He heard the phone ring around 4:00 a.m., *id.* at 85, but did not answer the call because he thought he was dreaming, *id.* At around 6:00 a.m., Mr. Davis received a call that the Property was ablaze. *Id.* at 84-85. Mrs. Davis stated during her interview with Jordan that she was at home in bed with Mr.

Davis the entire night. Jordan Dep. [79-4] at 44-45.

Jordan contacted Ms. Skipper and "communicated with her through a series of text messages." *Id.* at 62. Ms. Skipper informed Jordan that "she was at the location where she had moved to, where she was currently living" at the time of the fires. *Id.* Jordan did not follow up with anyone else to confirm this alibi, partly because Ms. Skipper told him that "she had sentimental stuff that was there that belonged to her deceased mother that she lost as a result of the fire." *Id.* at 63.

On February 24, 2015, Allstate's counsel sent a letter to Mr. Davis requesting credit card statements, debt documents, and documents relating to certain withdrawals from his bank accounts. Letter [74-11]. Mrs. Davis responded and explained that almost $35,000.00 was withdrawn from Mr. Davis' retirement fund on December 15, 2014. Letter [74-12]. The Davises spent nearly $6,000.00 to pay off a credit card and $21,100.00 towards the principal on their home and taxes on the Property. *Id.*

Allstate ultimately denied Mr. Davis' claim in writing on March 19, 2015, based upon the concealment/fraud provision and the intentional/criminal acts of any insured person provision. Denial Letter [74-5]. Allstate's sole basis in this litigation for denying the insurance claim is its defense that the fires were incendiary in origin. Jordan Dep. [79-4] at 43.

B.  Procedural History

On October 20, 2016, Mr. Davis filed a Complaint in the Circuit Court of Jackson County, Mississippi, Compl. [1-1], raising claims against Allstate for breach

7

of contract, bad faith, and punitive damages.[1]  *Id*. at 3-4, 6-7.  Allstate removed the case to this Court on the basis of diversity jurisdiction on November 21, 2016.  Not. of Removal [1].  In the present Motion [74] before the Court, Allstate moves for partial summary judgment on Mr. Davis' claims for bad faith and punitive damages.  Allstate contends that the bad faith claim fails because it had an arguable basis to deny Mr. Davis' insurance claim under the defense of civil arson.  Def.'s Mem. [75] at 2.  Allstate maintains that it has established that the fires were deliberately set based on Jones' investigation, *id*. at 7, and posits that the need to spend a considerable amount of money to repair the Property gave Mr. Davis the motive to destroy the Property and receive the insurance benefits, *id*. at 10.  Allstate also contends that Mr. Davis had the opportunity to set fire to the Property because he lives only one to three minutes away and was not seen that morning until 6 a.m.  *Id*. at 12.  With regard to punitive damages, Allstate argues that the issue should not be submitted to the jury because Mr. Davis cannot show that Allstate lacked an arguable basis for denying his insurance claim or that Allstate acted with malice, gross negligence, or reckless disregard for his rights.  *Id*. at 18.

   Mr. Davis responds that there is no arguable basis to support the denial of his insurance claim.  Pl.'s Mem. [80] at 2.  Mr. Davis maintains that there is no conclusive proof that the fires were set intentionally, as the Crime Lab detected no accelerants in debris samples from the Property and Flaggs testified that he had no evidence to indicate that the fire was incendiary.  *Id*. at 3-4.  With regard to

---

[1]     The Complaint also named insurance agent Russell Howard Dossett as a Defendant, but the Court dismissed Dossett upon Joint Motion of the parties.   Order [9].

motive, Mr. Davis alleges that it was Ms. Skipper who had the motive to burn the house, and that he would have no problem getting the Property ready for occupancy with his abundant funds and excellent borrowing power. *Id.* at 6-7. Mr. Davis submits affidavits from himself and his wife attesting that he was asleep at the time of the fires and therefore lacked an opportunity to set them. *Id.* at 8-9. Mr. Davis posits that summary judgment on his punitive damages claim would be improper because Allstate's defense is "contrived or specious," and Allstate's failure to continually evaluate the claim and consider the Crime Lab report amounts to malice, reckless indifference, or gross negligence. *Id.* at 10-11.

Allstate replies that Mr. Davis mistakenly emphasizes Flaggs' testimony because Flaggs never completed his investigation. Reply [82] at 3-4. Allstate also maintains that the Crime Lab report did not exist at the time Jones prepared his report and was not available to the public. *Id.* at 5.

## II. DISCUSSION

A.  Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant carries this burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

To rebut a properly supported motion for summary judgment, the opposing

party must show, with "significant probative evidence," that there exists a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000). "A genuine dispute of material fact means that evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v. CCC&R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quotation omitted). If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Cutting Underwater Techs. USA, Inc. v. ENI U.S. Operating Co.*, 671 F.3d 512, 516 (5th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). In deciding whether summary judgment is appropriate, the Court views facts and inferences in the light most favorable to the nonmoving party. *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 858 (5th Cir. 2010).

B.  Mr. Davis' Bad Faith Claim

Allstate raises the defense of willful incendiarism, and seeks summary judgment on Mr. Davis' bad faith claim. Because this case arises under the Court's diversity jurisdiction, Mississippi substantive law applies. *Cox v. Wal-Mart Stores E., L.P.*, 755 F.3d 231, 233 (5th Cir. 2014); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). "Under Mississippi law, wilful incendiarism by an insured is a defense to the insurer's liability." *McGory v. Allstate Ins. Co.*, 527 So. 2d 632, 634 (Miss. 1988). "Arson like adultery is seldom seen, and [Mississippi] law allows that it be proved circumstantially." *Id.* When an insurer seeks to avoid coverage on grounds that the insured committed civil arson, the insurer must prove each of the following elements by clear and convincing evidence: "(1) an incendiary fire; (2)

10

motive of the insured to destroy the property; (3) evidence that the insured had the opportunity to set the fire or to procure its being set by another." *Id.* at 634-35.

While these elements are "required for an insurer to prevail on an arson defense to the underlying contract claim," Mr. Davis also brings a claim of bad faith, on which he bears a higher burden than on his breach of contract claim. *Reece v. State Farm Fire & Cas. Co.*, 684 F. Supp. 140, 146 (N.D. Miss. 1987) (citing *Vicksburg Furniture Mfr., Ltd. v. Aetna Casualty and Surety Co.*, 625 F.2d 1167 (5th Cir.1980)). "[A] bad faith refusal claim is an 'independent tort' separable in both law and fact from the contract claim asserted by an insured under the terms of the policy." *Hartford Underwriters Ins. Co. v. Williams*, 936 So. 2d 888, 895 (Miss. 2006).

Mississippi courts "have come to term an insurance carrier which refuses to pay a claim when there is no reasonably arguable basis to deny it as acting in 'bad faith,' and a lawsuit based upon such an arbitrary refusal as a 'bad faith' cause of action." *Blue Cross & Blue Shield of Miss., Inc. v. Campbell*, 466 So. 2d 833, 842 (Miss. 1984). "Arguably-based denials are generally defined as those which were rendered upon dealing with the disputed claim fairly and in good faith." *Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1184 (Miss. 1990). "The plaintiff bears a heavy burden in demonstrating to the trial court that there was no reasonably arguable basis for denying the claim." *Windmon v. Marshall*, 926 So. 2d 867, 872 (Miss. 2006). "In determining whether [the insurer] had an arguable basis for denying the claim in the present case, the Court should consider the facts

11

that were available to [the insurer] at the time the claim was denied." *State Farm Mut. Auto. Ins. Co. v. Grimes*, 722 So. 2d 637, 641 (Miss. 1998). With these principles in mind, the Court turns to Allstate's assertion of willful incendiarism.

1. <u>Was the Fire Incendiary?</u>

For purposes of Mr. Davis' bad faith claim, Allstate has carried its initial summary judgment burden of showing the incendiary nature of the fires. Fire investigator Jones concluded that the cause of the fire was classified incendiary and made numerous findings to support this conclusion. Jones observed that electrical and gas services were not connected at the time of the fires, an access opening in the hallway ceiling had been removed which allowed flames to easily access the attic, and the flooring damage was consistent with an ignitable liquid. Jones determined that the separate points of origin of the fires were indicative of human involvement. Jones detected an odor similar to that of gasoline in the HVAC closet, and the EFI lab reported that the debris from the area contained a relatively high level of gasoline residue. Allstate "was permitted to rely on its expert's finding that the fire which destroyed [Mr. Davis]' home was incendiary in origin and involved the use of some liquid accelerant." *Reece v. State Farm Fire & Cas. Co.*, 684 F. Supp. 140, 146 (N.D. Miss. 1987). Allstate had an arguable basis to conclude the fire was incendiary.[2]

---

[2] Allstate notes that Mr. Davis asserted in his Sworn Statement in Proof of Loss that the "house was set on fire by an unknown person." Statement [1-2] at 1. However, Mr. Davis's affidavit attests that his acknowledgment that the fire was intentionally set "is based upon information that I received from the adjuster, Wilbur Jordan." Pl. Aff. [79-1] at ¶ 5. Mr. Davis also testified in his deposition that the fire department did not tell him the fire was intentionally set. Pl. Dep. [74-6] at 38.

Mr. Davis points to Flaggs' testimony that he has no evidence to indicate an incendiary fire. Flaggs Dep. [79-5] at 65-67. However, Mr. Davis has put forth no evidence regarding Flaggs' qualifications, experience, or the methods he used in his investigation. Perhaps more importantly, Flaggs was removed from the case and never completed his investigation.

Mr. Davis also notes that Jordan did not review the October 23, 2014 Mississippi Crime Lab report before Allstate denied Mr. Davis' claim on March 19, 2015. Def.'s Resps. to Pl.'s First Reqs. for Admis. [79-6] at 7. There is no evidence to show that the Crime Lab report was available to Allstate at the time it denied Mr. Davis' claim. Flaggs sent debris samples to the Crime Lab as part of an ongoing police investigation, and nothing in the record before the Court indicates when that investigation closed. Even having the Crime Lab report available now, the report at most creates a conflict in the evidence, but does not rise to the level of showing that, as a matter of law, Allstate lacked an arguable basis to conclude the fires were incendiary, especially given the evidence indicating both human involvement and the presence of an ignitable liquid. Allstate's evidence is legally sufficient on the issue of incendiarism.

2. Has Allstate Sufficiently Demonstrated Motive?

Allstate has also sufficiently shown that Mr. Davis had motive to destroy the Property. It is undisputed that Mr. Davis would have received $91,000.00 from insurance had the house burned. Further undisputed is the condition of the Property immediately before the fires. According to Mr. Davis, he would have had

13

to repair the damage before renting the Property out to a new tenant. It did not help Mr. Davis that Ms. Skipper allegedly shorted him on the deposit and left him with a $400.00 light bill. Mr. Davis maintains "that between his abundant funds and excellent credit/borrowing power, Mr. Davis would not have had any problem whatsoever in getting the premises repaired and ready for a speedy occupancy." Pl.'s Mem. [80] at 6-7. This argument only confirms that Mr. Davis would have had to spend and/or borrow more money to repair the Property, which the record indicates had not been a particularly profitable venture.[3]

Mr. Davis counters that Ms. Skipper had a motive to set the fires in order to get out of her lease and to seek revenge; however, according to Mr. Davis' own testimony, the two had agreed to end Ms. Skipper's lease early. Mr. Davis stated that Ms. Skipper's lease expired on October 1, and the fires were set on October 5. Ms. Skipper had a number of personal possessions at the Property at the time of the fires, and there is no evidence that these items were covered by Mr. Davis' insurance or that Ms. Skipper had renter's insurance. Nothing in Mr. Davis' recounting of his discussion with Ms. Skipper regarding her complaints and desire to terminate the lease supports a reasonable inference that she harbored such animosity toward Mr. Davis that she would have been motivated to set fire to the

---

[3] Allstate points to Mr. Davis' withdrawal of retirement funds to pay off debts, taxes, and his house. The relevance of this evidence is unclear. In *Grimes*, 722 So. 2d at 641, the Supreme Court of Mississippi found unconvincing State Farm's assertion that Grimes' financial problems gave him motive to commit fraud: "Grimes' financial problems, as evidenced by his 'maxed out' credit cards, were no different than those faced by many, and there should not be a different standard for the payment of claims of wealthy claimants than those with financial difficulties." But in *McGory*, 527 So. 2d at 636, motive was "well established" by McGory's "long overdue debts of approximately $50,000.00, some of which had been turned over for collection." Because the Court finds that Allstate has sufficiently shown motive through other evidence, the Court declines to address this particular evidence.

Property twice. When Ms. Skipper was apparently displeased with the Property's conditions and Mr. Davis, she went to the Housing Authority to seek redress. Mr. Davis gave her the relief she sought. The evidence shows that on the day of the fire, Ms. Skipper had secured a new residence. For purposes of this Motion, Allstate has sufficiently supported its position that Mr. Davis possessed motive.

    3.    <u>Was There Opportunity?</u>

The final element Allstate must establish is whether Mr. Davis had the opportunity to set the fires or to procure their setting by another. Allstate does not argue or allege that Mr. Davis directed someone else to set the fires. Mr. Davis states that he was asleep that night until a phone call at around 6:00 a.m. awoke him. Pl. Aff. [79-1] at ¶ 3-4; Pl. Dep. [74-6] at 28. Mrs. Davis told Jordan that she was at home in bed with Mr. Davis the entire night. Jordan Dep. [79-4] at 44-45. Mrs. Davis testified at her deposition that she did not hear the phone ring at 6 a.m., but Mr. Davis woke her up at around 6 a.m. and told her about the fire. Mrs. Davis Dep. [74-7] at 18. She testified that she does not know if Mr. Davis ever got up at any point during the night to walk out of the bedroom. *Id.* at 19. In support of his opposition to Allstate's Motion, Mr. Davis has now submitted an affidavit from his wife, dated October 26, 2017. Mrs. Davis Aff. [79-3]. In this affidavit, Mrs. Davis attests:

> When my husband gets up in the night to use the bathroom, or for any other purpose, I am usually awakened by his actions. During the morning hours of October 5, 2014[,] I was never awakened by my husband getting up, but I do recall his phone ringing. I do not recall my husband getting out of bed.

15

> To my knowledge, my husband never left the house until after he received a second phone call around 6:00 a.m. on October 5, 2014. I had already awakened and had been out of bed since 5:30 a.m.

*Id.* at ¶ 2-3

It is undisputed that Mr. Davis had access to the Property, as he inspected the Property's interior in the days before the fires. It is also undisputed that Mr. Davis lived just two or three minutes away from the Property. It bears repeating that there were two fires that morning. If an individual indeed set the fires, the culprit would have had to remain close enough to the Property to return quickly after firefighters left the first time. Furthermore, the culprit would have had to know that firefighters extinguished the first fire in order to return and start another fire.

Though Allstate cannot point to direct evidence that Mr. Davis was at the Property during the night, Mississippi allows arson to be proved circumstantially as it is seldom seen. *McGory*, 527 So. 2d at 634. Mrs. Davis has supplied evidence to infer that Mr. Davis was asleep throughout the night, but Mississippi law does not "ignore the propensity of one spouse to partake of a fraudulent scheme to help the other out of serious financial difficulties." *Id.* at 636. Moreover, her testimony is merely that she was asleep during the time of the fires and was not awakened by Mr. Davis. In *McGory*, the Supreme Court of Mississippi concluded that "Allstate's proof on the opportunity issue fails as a matter of law" because witnesses who were actually awake and conscious during the time of the fire testified that they were with the insured plaintiffs. *Id.* at 637. Here, no such evidence has been

16

presented, and no one who was awake during the time of the fires can confirm Mr. Davis' alibi. Allstate has established a good-faith, arguable basis for its denial of Mr. Davis' insurance claim and is therefore entitled to summary judgment on this claim.

C.  Mr. Davis' Claim for Punitive Damages

Mr. Davis seeks punitive damages from Allstate. "The plaintiff has a 'heavy burden' when seeking punitive damages based on a bad faith insurance claim." *Jenkins v. Ohio Cas. Ins. Co.*, 794 So. 2d 228, 232 (Miss. 2001). "Punitive damages should be assessed with caution and within narrow limits as an example and warning." *Id.* In Mississippi, the issue of punitive damages on a bad faith insurance claim should not be submitted to the jury unless the trial court determines that there are jury issues with regard to whether the insurer: 1) lacked an arguable or legitimate basis for denying the claim; and 2) committed a willful or malicious wrong, or acted with gross and reckless disregard for the insured's rights. *Id.* at 232-33.

Mr. Davis contends that Allstate cannot reasonably expect to succeed on any claimed defense and its assertion of incendiarism, motive, and opportunity is contrived or specious. However, as discussed above, Allstate has sufficiently established an arguable basis for denying Mr. Davis' claim. Mr. Davis also maintains that Allstate's failure to consider the Mississippi Crime Lab report amounts to gross negligence. "[A]lthough it is well settled under Mississippi law that an insurance company has a duty to investigate promptly and adequately an

17

insured's claim, a plaintiff's burden in proving a claim for bad faith refusal goes beyond merely demonstrating that the investigation was negligent." *Murphree v. Fed. Ins. Co.*, 707 So. 2d 523, 531 (Miss. 1997) (internal citation omitted). "[T]he level of negligence in conducting the investigation must be such that a proper investigation by the insurer would easily adduce evidence showing its defenses to be without merit." *Id.* (citation and quotation marks omitted). "[E]vidence showing an insurer's defense to be without merit requires that further investigation would undercover (sic) evidence that would have undermined at least the arguable merit of the insurer's defenses." *Sobley v. S. Nat. Gas Co.*, 302 F.3d 325, 342 (5th Cir. 2002) (citation and quotation marks omitted).

Though Mr. Davis contends Allstate should have reviewed the Mississippi Crime Lab report, such further investigation would not have by itself undermined Allstate's good faith determination that the fires were incendiary. Allstate's conclusion that the fires were incendiary was based upon numerous findings other than just the EFI lab's detection of ignitable fluids in fire debris, which Mr. Davis contends is inconclusive. Jones found that two fires erupted at separate points of origin, an opening in the hallway ceiling was removed so the flames could easily access the attic, the flooring was damaged in a manner consistent with an ignitable fluid, all potential accidental ignition sources were excluded, and the electrical and gas services were not connected at the time. Furthermore, Jones smelled an odor similar to gasoline in the HVAC closet. A single lab report showing differing results from these findings would not, by itself, demonstrate that Allstate's denial

18

lacked an arguable basis. The facts before the Court do not indicate a basis for awarding punitive damages, and Allstate is entitled to summary judgment on Mr. Davis' claim for punitive damages.

### III. CONCLUSION

The Court finds that Allstate had an arguable basis for its denial of Mr. Davis' fire loss claim and that he has failed to present sufficient evidence to create a genuine issue of fact concerning whether Allstate committed a willful or malicious wrong or acted with gross and reckless disregard for his rights. Allstate's Motion [74] for Partial Summary Judgment should be granted, and Mr. Davis' claims for bad faith and punitive damages should be dismissed with prejudice.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that Defendant Allstate Insurance Co.'s Motion [74] for Partial Summary Judgment is **GRANTED**, and Plaintiff Darrell Davis' claims for bad faith and punitive damages are dismissed with prejudice.

**SO ORDERED AND ADJUDGED**, this the 14th day of December, 2017.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE